Strong, J.
 

 There is no doubt but that the liability of the defendants, if any, is joint, and that.each is responsible, so far as he is responsible at all, in solido. The purchases authorized by their contract with each other were to be joint, and there was
 
 *423
 
 to be no severance of their interests in the lands acquired, if subsequently sold for their benefit, or if not sold, until a final settlement should be made. The defendants contend hc-wever, that so far as they were concerned, Greves acted simply as their agent, and that they were not bound by any purchase which he made, unless it corresponded with the time of, and was fully authorized by, their articles of association, and that there was an essential departure in the terms and manner of payment. Although I readily concede that a principal is not bound by the acts of his agent when he exceeds his authority, yet there is good reason why we should hold that the excess complained of should be clearly made out, and that it should be in soma substantial matter. The agent is selected by the principal, and the selection is of itself a recommendation to the world, at lé'irí, of his integrity and capacity to do what is intrusted to him. V any one must sustain a loss by reason of his incapacity or ue faithfulness, it would seem to be right, that it should be th, ' party who has placed him in a situation to effectuate the evil This must be understood, however, as applying to his conduct while acting in the business intrusted to him, and substantially according to the instructions of his principal. Where there is a clear departure, or excess, a prudent person who deals with him would not be misled.
 

 In the case under consideration there are two clear limitations of the power to purchase, one applying to the locality of the land, and the other to the extent of the consideration money. It is provided in the clause conferring the powers, that the land should be situated in the western states, or the (then) territories of Michigan or Wisconsin, and that the aggregate amount of the consideration money should not exceed thirty thousand dollars. The plaintiff’s sale was in accordance with each of those particulars. The agreement that upon all purchases for the parties, Greves should draw on the defendant Sherman at not less than ten days’ sight, which the defendants suppose has been violated, is at the end of, and included in, a clause making several provisions for the conduct of the associates after their purchases should be made, and if the rule
 
 cognoscitur a sociis
 
 is applicable, and I think it is, it was designed
 
 *424
 
 v.0 control their transactions with each other, and not as a limitation of the power of their agent in making the primary purchases. If it could at all affect the rights of the vendor, it would be straining a point further than either the language used by the parties, or the justice of the case requires, to extend it, beyond the payment, to the sale itself. The sale might be valid, and yet the vendees be primarily liable to pay the money only in the manner indicated. That there was at first a departure in terms from the stipulation in the agreement in this particular, there can be no doubt. The substitution of the notes for drafts could not, however, have materially injured the associates, as they were to have been paid by the same person, and of course with the same funds. The objection so far as it related to the character of the instruments, was subsequently removed by changing the notes into drafts.
 

 • There was nothing in the original articles of agreement requiring that Greves should draw for the purchase money immediately after the sale. It was probably the expectation of the parties that he would do so, but a disappointment in this particular was not enough to exonerate them from liability to perform a contract made for their benefit. It was said, by Chief Justice Nelson, when this case was decided by the late supreme court, that by the terms of the association the purchases were to be made for cash. With great deference, I cannot find any thing positively requiring that in the articles, nor is such an intent inferable from the conduct of the defendants. The drafts were to be at
 
 not less
 
 than ten days’ sight. Nothing was said as to the other limit: but surely if it had been deemed a matter of consequence to the' associates that the sales should have been for cash, or what should be its equivalent, the parties would have said so in explicit terms. Their only anxiety seems to have been the other way—that they should have sufficient time after the drafts should be received to raise the requisite funds to pay them. They doubtless did not apprehend any injury to themselves from an extension of the time of payment, and as they were not under any obligation to deposit the money with the paying party qntil then, it is difficult to perceive how they could ®e injured by the delay. It is quite apparent that the contract
 
 *425
 
 ors themselves viewed the matter much in the same way. The terms of the sale in the instances under consideration were made known, soon after it was effected, to five of the associates—Sherman, Porter, Vanderpool, Croswell and Corning—and they approved of the purchase, and of the terms designated for the payment of the purchase money. " There were thirteen drafts drawn by Greves upon Sherman for the purchase moneys under the agreement in question, and a supplementary agreement for a similar purpose between the same parties, (except Graham,) made in June of the same year, neither of which was a sight draft, and each of them was payable from sixty to ninety days after date. Those thirteen drafts were all paid, and, so far as appears from the testimony .in this cause, without objection. It does not appear that the plaintiff ever saw the articles of association, but if they were exhibited to him, he had a right to infer from the conduct of the parties that they did not intend to adhere to the manner of payment therein specified, or, at any rate, that they would not attempt to invalidate a sale by reason of a 'variation in a matter which they did not deem material. Upon the whole, it appears to me that Greves had the requisite power to make the purchase in question from the plaintiff for the associates, and that, under the circumstances, it was not materially violated by the variance between the terms of payment as eventually arranged, and those mentioned in the articles of association.
 

 But if the objection of variance was at first available, it was subsequently waived by those whom it is now sought to charge. We have seen that it was clearly waived by all but Graham. It was virtually waived by him, as well as his associates. A part of the purchase money was paid at the time of the sale, and the deed was executed, recorded, and delivered to Sherman, who was fully authorized to receive, and hold it, for all the purchasers. He received it without objection, knowing all the material circumstances attending the sale, and has continued to hold it until the present time. If he intended to object to the terms of sale, he should have done so promptly. The plaintiff might then have taken his land back, and probably without loss. As it is, the title has been out of him for a number of
 
 *426
 
 years, and he has not had the power either to improve or enjoy it himself, or to sell it to others. The law will not allow a vendee, ^either by himself or his agent after the lapse of so long a period, the option to retain' or return the land as may be most advantageous to himself. If he receives the deed in person, it is a waiver of all objections known to him at the time ; and if by one acting in the double capacity of agent and principal acquainted with the facts, who retains it for a considerable period under circumstances from which a communication of such facts to his associates may reasonably be presumed, it is equally a waiver by the co-principal. In this case, the inference beyond any reasonable doubt, is that Sherman communicated the facts relative to so large a purchase to his associates, all of whom were active, intelligent, business men, and all residents with him in Albany, except Graham, who resided in New-York.
 

 There is sufficient in this case to show that the plaintiff sold his land to the associates, and conveyed it to one of them virtually at their request, and to make them liable for the payment of the balance of the consideration money. I can see no reason for deducting the money paid to Greves on account of this purchase, and retained by him. He was not the agent of the plaintiff but of the associates, who should of course sustain any loss caused by his misfeasance. But the plaintiff does not insist upon his appeal from the judgment of the supreme court, where the deduction was allowed, nor does he ask for a reversal of the judgment on that account, or at all.
 

 But if there should be any doubts as to the efficacy of the sale in question to bind all the associates, on the supposition that Greves acted for parties having separate and distinct interests, there can be none if, as the plaintiff contends, they were limited partners. A mere agent acts simply under a delegated authority, to which, for many palpable reasons, he must substantially conform, to render his acts obligatory upon his principal. But a partner acts for himself in all the business relating to the association. And although he is at the same time an agent for his copartners, yet the identity of interest is ordinarily a sufficient guaranty that he will not abuse his trust. Any directions which he may have from them are simply advisory,
 
 *427
 
 and not obligatory as to third parties. The connection is, and evidently should be, a sufficient indication of his authority to the world. The general principle which governs partnership in trade is, that each constitutes the other his agent for the purpose of entering into all contracts for him within the scope of the partnership concerns, and consequently that he is liable for the performance of all such contracts in the same manner as if entered into personally by himself. (6
 
 Bing.
 
 693;
 
 Coll. on Part.
 
 104.) To allow any private arrangements between themselves to affect the validity of their dealings with others, would not only be unjust, but would shake the credit, and destroy the utility, of those associations.
 

 The articles of agreement between the parties to this suit and their deceased associates, provide for all the essential elements of a limited partnership. A joint fund was to be provided, which was to be expended in the purchase of lands which were to be taken, and might be sold, jointly for all the parties; there was to be an eventual division of the funds which might be acquired among the whole; and all were to participate in the profit and loss which might result from the undertaking. I readily concur in the remarks made by my brother Bronson in
 
 Porter
 
 v. McClure, (15
 
 Wend. 187.)
 
 that “a mere community of interest in land doe's not make men partners, nor does a mere community of interest in personal property. There must be some joint- adventure, and an agreement to share in the profit and loss of the undertaking.” In the case under consideration, the parties to the agreement were not to be simply tenants in common with the ordinary attributes of that relation; their engagement was not confined to a single purchase of property in which they were primarily each to have separate interests, and where each might sell his. share for his individual benefit; but they were to be engaged in a general undertaking for the successive sale and purchase of real estate—in the language of Judge Bronson, “ a joint adventure” under a contract “ to share in the profit and loss” which might result from their dealings. They were beyond all doubt partners, if that relation can exist among persons who connect themselves together for the sole
 
 *428
 
 purpose of speculating in lands for their mutual profit and advantage.
 

 The principle that a joint undertaking among two or more persons who are to participate in the profit and loss resulting from
 
 it,
 
 constitutes a partnership, is laid down generally in the books without reference to the property to which their dealings might relate. The word “ res” is used by many of the old writers without qualification, and that may designate as well things real as personal. By the Roman law where the
 
 societas
 
 uni
 
 versorum, bonorum
 
 was established, the parties put into common stock all their property
 
 real
 
 and personal.
 
 (Pothier, Traits du Conde Soc. No.
 
 28, 42.) That connexion also held and employed all the property, real as well as personal, in Spain.
 
 (Inst. of the Civil Law of Spain, by Asso. & Manual, b. 2, c.
 
 15,) and in Holland
 
 (Inst. of the L. of Holland, by J. Vander Linden, translated by Henry, p.
 
 573.) The same rule prevailed, and I think still prevails, in France. The English authorities admit that' partnerships may acquire and dispose of lands as partnership property. In
 
 Feriday
 
 v.
 
 Wightwick,
 
 (1
 
 Russ.
 
 &
 
 Mylne,
 
 45,) it was declared that the general principle in the English law is that real estate acquired for the purpose of a trading concern, is to be considered as partnership property, and to be first applied in satisfaction of the demand of the partnership. Lord Loughborough, in
 
 Smith
 
 v.
 
 Smith,
 
 (5
 
 Vesey,
 
 189,) speaking of
 
 the
 
 lands in controversy in that case said,, “ if these estates had only been conveyed to one partner, having been purchased with partnership funds, they would have been part of the partnership property.” Gow, in his treatise on partnership, page 48, says, “ in equity therefore, lands bought by a commercial partnership for the purpose of the partnership concern, are to be considered as forming a part of the partnership funds.” The same principle is laid down by Collyer,
 
 (Laws of
 
 Partnership,
 
 p.
 
 67.) In
 
 Buchan
 
 v.
 
 Sumner,
 
 (2
 
 Barb. Ch. R.
 
 198,) Chancellor Walworth says, “ where real estate is purchased with partnership funds for the use of the firm, and without any intention of withdrawing the funds from the firm for the use of all or any of the members thereof as individuals, I believe it has never been doubted in England but that such estate was in equity to be
 
 *429
 
 considered and treated as the property of the members of the firm collectively. He cites, in support of his opinion,
 
 Lake
 
 v.
 
 Craddock,
 
 (3
 
 P. Wms.
 
 158;)
 
 Watson on Partnership,
 
 72,
 
 and Gow on the same subject,
 
 48, 288. Mr. Bell in his commentaries
 
 (vol. 2, §
 
 7,
 
 ch.
 
 1,
 
 p.
 
 613,) says that by the law in Scotland, “the common stock’’ [of partners] includes
 
 all lands, houses,
 
 ships, leases, commodities, money—whatever is contributed by the partners to the company use. It comprehends also whatever is created by the joint exertions of the company, or acquired in the course of the employment of their capital, skill and industry. All this by the operation of law and the nature and effect of the contract, becomes common property, is held by all the partners jointly for the uses of the partnership, and is directly answerable as a stock for the payment of their debts. As to land and other property, which by the forms of territorial conveyance require to be transferred by deed, the parties will acquire by the contract nothing more than the
 
 jas ad rem,
 
 by virtue of which they may in a declaration and adjudication in implement have that property declared and adjudged to the partners jointly, or to a trustee as a part of the stock of the concern.” The rule that partners may deal in real estate partially or even altogether has prevailed extensively in this country. Judge Story, in his valuable work on partnership, says, (§ 83,) “ there is no positive incompetency at the common law of
 
 creating a partnership
 
 in the buying and selling of lands on joint account, and for the benefit of the parties by way of commercial speculation and commercial adventure; and further, (§ 92,) " nor is there in reality as between the partners themselves any difference whether the partnership property held for the purposes of the trade or business consists of personal or moveable property, or of real or immoveable property, or of both, so far as their ultimate rights and interests therein are concerned.” Chancellor Kent says, (3
 
 Com.
 
 37,) “ If partnership capital be invested » in land for the benefit of the company, though it may be a joint tenancy in law, yet equity will hold it to be a tenancy in common, and as forming part of the partnership fund.” It was decided in
 
 Hoxie
 
 v.
 
 Carr.
 
 (1
 
 Sumner’s R.
 
 173,) and also in
 
 Randall
 
 v.
 
 Randall,
 
 (7
 
 Simons,
 
 271,) that where real estate is purchased for
 
 *430
 
 partnership purposes and on partnership' account, let the legal title be vested in whom it may, as where the conveyance is taken to'the partners as tenants in common, it will in equity be deemed partnership property. In
 
 Terrell
 
 v.
 
 Richards,
 
 (1
 
 Nott & McCord’s R.
 
 20,) where two had entered into a covenant, by which one was to advance to the other a sum of money to be laid out in the purchase of lands for their joint account, and all losses and gains were to be equally shared, it was held that this constituted a partnership. In
 
 Sigourney
 
 v.
 
 Mann,
 
 (7
 
 Conn. R.
 
 11,) it was held that real estate acquired with partnership funds for partnership purposes will be regarded in equity as partnership stock, and liable
 
 to
 
 all
 
 the
 
 incidents attending that description of property;
 
 and that real estates
 
 originally put in as partnership stock, or subsequently acquired.with partnership funds, may by agreementof the partiesin their articles become partnership stock. In
 
 Robinson
 
 v.
 
 Crowder,
 
 (4
 
 McCord’s R.
 
 519,) it was in effect decided that one partner can transfer the real estate of the firm, in a case in which the buying and selling of real estate is the object of the copartnership. In
 
 Dudley
 
 v.
 
 Littlefield,
 
 (8
 
 Shepley’s R.
 
 44,) the chief justice, in delivering the opinion of the court, said, “ nor do we see why there may not' be a partnership in .buying and 'selling land as well as in any other vendible property. It is an agreement merely to share in the profits and loss of negotiations. The rules for transferring lands may be different from those for the transfer of personal estate, but that can make no difference in the result as* to profit and loss.” In
 
 Brady
 
 v.
 
 Kalkam,
 
 (1
 
 Penn. R.
 
 147,) and
 
 Kramer
 
 v.
 
 Arthur,
 
 (7
 
 Barr’s Penn. R.
 
 165,) it was held that partnerships to speculate in real estate are legal.
 

 The doctrine thus emphatically laid down in some of our sister states has never been denied, either in our supreme court or court of.dernier ressort. It has been doubted, and partially de-‘ nied, by the late vice chancellor of the first circuit, in a case now before us,
 
 (Patterson
 
 v. Havens,) but the contract in that case was before the supreme court of Pennsylvania, in
 
 Kramer
 
 v.
 
 Arthur,
 
 which I have just cited, and it was there held that it constituted a partnership. In some of the cases in our courts they have decided that lands acquired by partners in the course
 
 *431
 
 of their business are held by them as tenants in common, and are subject to the ordinary rules of descent. But they all recognize the principle that they may be acquired and held as partnership property. It is admitted in
 
 Coles
 
 v.
 
 Coles,
 
 (15
 
 John.
 
 159, 161,) that there may be special covenants and agreements entered into between the partners relative to the use and enjoyment of real estate owned by them jointly, and the land would be considered as held subject to such covenants. In
 
 Smith
 
 v.
 
 Jackson,
 
 (2
 
 Edw. V. C. R.
 
 34,) the vice chancellor cites
 
 Winslow
 
 v.
 
 Chiffelle, (Harp. Eq. R. of S. C.
 
 24,) where it was decided that it was immaterial -whether land assumes the character of real or personal estate in becoming partnership property as respects the rights of joint creditors of the partnership, for,if land under either character becomes partnership property, it must upon principle be liable to partnership debts. This the vice chancellor says is doubtless correct. In
 
 Lawrence
 
 v.
 
 Taylor,
 
 (5
 
 Hill,
 
 107,) it was held that a contract to convey lands belonging to two partners, subscribed with the firm name by one of them under a parol authority from the other, was valid and binding as against both. Cowen, J.
 
 (p.
 
 111,) said, “ In the court of chancery perhaps the mere partnership in these lands would have been sufficient to render the contract binding on Taylor, (the partner who had not signed it.) They were,treated as partnership property by the contract, and in admitting the validity of that, and claiming under it, Taylor in the same breath admitted that the lands belonged to the firm. In equity they would, if in truth belonging to the firm, have been treated as personal estate, and that court might have decreed a specific execution” (of a contract of sale, made and signed by one partner only,) “ by both partners.”
 

 The principal difficulty, applicable as well to cases where partnerships deal occasionally in lands, as where all their operations are confined to real estate, and that which has given rise to the doubt which has existed to some extent on this question, results from the laws relative to the conveyance and descent of real estate. A partner can make a contract for himself and his associates for the sale of real estate, which could be enforced against all in a court of equity. But it seems that he
 
 *432
 
 cannot execute a conveyance for his associates without a special power from them having reference to that transaction. I can see no reason, however, why a valid general power for each to execute deeds as attorney for the others, might not be inserted in the articles of copartnership. The trust would not be greater, nor liable to more abuse, than that which now exists in reference to the disposition of personal property. That would re move the difficulty in reference to the transfer of the whole real estate during the joint lives of all the partners. In the event of the death of one of them before alienation, (as that would be in effect a revocation of the power of attorney,) the title to his share of any land wffiich they might hold would descend to his
 
 heirs, but it would still be
 
 subject
 
 to the
 
 equitable rights of the surviving partners. The heir could take no more than the individual estate of the ancestor, which would be a share after all the demands against the partnership had been fully satisfied. "The dower of the widow of the deceased partner would, as I conceive, be subject to the same equity. The estate of inheritance of the husband, in which alone she could claim dower, would be what remained after satisfying the partnership debts. I
 
 speiA
 
 in reference to lands acquired with partnership funds. If a husband should convey his separate lands to the connection, they would of course remain subject to the inchoate right of dower of the wife, unless she joined with him in making the conveyance. In all these eases, purchasers would not be decern'd if the conveyance to the partners should, as it ought to, designate
 
 the
 
 land as partnership property. And as to the partners themselves, their several interests are sufficiently protected by the principle adopted in courts of equity, of considering the real estate as personal property, and subjecting it to the same rules.
 

 But whatever doubts may exist as to the power of disposition during the joint lives of all the partners, or the rights of surviving partners against the representatives of their deceased associate, there can be none as to the right of any member of a firm instituted for the purpose of trading in lands, to purchase real estate for the firm, and to bind all the members for the payment of the consideration money. That was admitted in the case in
 
 *433
 

 5th Hill,
 
 which I have before quoted, and is not, I believe, any where denied.
 

 If by the terms of the articles of agreement, Greves was to have received only a part of the profits as a compensation for his services, that alone would not have constituted him a partner. But he was entitled to a share of the lands when pur- - chased, which might form the substratum of future operations. This made him a full partner with the attending powers and liabilities. He should have been made a defendant with the others, but that objection is waived by the omission to plead the non-joinder in abatement.
 

 Upon the whole, I am satisfied that the articles of agreement constituted a partnership between the parties to that instrument. None of them were dormant partners so far as it related to the plaintiff, as Greves testifies that he made the purchase pursuant to the agreement, and he is supported in this particular by ‘the fact that the deed was not made to him, but to another of the associates who had been designated by the parties for that purpose. The connection may not have possessed all the attributes of an ordinary partnership for the usual commercial purposes, but there was sufficient to render a sale made to one of the partners, with the acceptance and retention of the conveyance by another, obligatory upon all the members of the association.
 

 The judgment of the supreme court must be affirmed.
 

 Jewett, Ch. J., Rugóles, Gardiner, Shankland, and Hoyt, Js. concurred in the opinion of Strong as to the joint liability of the defendants, but gave no opinion on the question of partnership.
 

 Bronson, J., and Cady, J., dissented, and the latter delivered his opinion as follows:
 

 James P. Greves, in his deposition, states that he purchased under the agreement of the 4th of April, 1836, of the plaintiff, one parcel of land for $7000. Three thousand were paid in cash, $4000 in two notes made by him as attorney for Watts Sherman. That he purchased four other parcels, to the aggre
 
 *434
 
 gate amount of $3830, making in all under tha,t agreement, $10,830 ; that he received $8000 for the purposes of paying for those lands, leaving a deficiency of $2830. If the five purchases were made in pursuance of the agreement, there is a balance due from the defendants to ,James P. Greves, which they are bound by a covenant to pay to him, by providing funds to enable Watts Sherman to pay his drafts. The judge at the circuit held that the defendants were bound to pay that balance to the plaintiff, with interest from the date of the purchase, and no more, although four thousand dollars and interest were due to him from the date of the purchase. If from the transaction between Janies P. Greves and the plaintiff, the law would imply a promise on the part of the defendants to pay the plaintiff for the land, it would be a promise to .pay the whole price, deducting only the sum which was in fact paid by James P. Greves as the agent of the defendants.
 

 Again, if the defendants are liable to the plaintiff on the ground that they have not paid to James P. Greves the full amount of his purchases, then the defendants must be liable to each of the other vendors on account of the same balance, and may on account of that balance be compelled to pay it five times over, if the balance due amount to such sums. The plaintiff can have no better claim to the balance due from the defendants to James P. Greves, than any other person from whom he purchased land and did not pay for it. There is no evidence that he paid the other vendors. It appears from his own deposition, that the first purchase he made was from the plaintiff, and that the defendants upon his drafts, paid more than enough to have paid the
 
 plaintiff;
 
 and there is no evidence that the defendants had notice of the other purchases. On the contrary, it is proved by the supplementary agreement made in June, 1836, that when that was executed, James P. Greves must have represented to the defendants that he had purchased land to about the amount of six thousand dollars; and it was then agreed that he should make no other purchases, under the agreement of April 4, 1836. The judge at the circuit adopted an erroneous rule, for if the plaintiff was entitled to recover
 
 *435
 
 any thing, he was entitled to recover the whole sum due for the land sold by him.
 

 The plaintiff, in the 2d and 3d counts in his declaration, alleges that the defendants were indebted to him in the sum of $10,000, for real estate before that time bargained and sold by the plaintiff to the defendants at their special instance and request, and at their special instance and request conveyed to •Watts Sherman. Independent of the agreement of April 4, 1836, there is no evidence of any bargain between the plaintiff and defendants, or of any request by them to the plaintiff, that he should convey any land to Watts Sherman; and how can it be said that that agreement furnished evidence from which a contract can be implied between the plaintiff and the defendants ? That contains a contract exclusively between the defendants and James P. Greves.. On their part it was a covenant to provide money in the city of Albany to meet such drafts as the said Greves should from time to time make on Watts Sherman, to an amount not exceeding $30,000, for lands in any of the western states or the territories of Michigan and Wisconsin, which money was to be expended by Greves at his discretion, in purchasing lands within the said states and territories, and the title to the lands to be taken in the name of Watts Sherman. The defendants were bound by their
 
 covenant to
 
 James P. Greves, to furnish funds with which to pay any draft which he should draw upon Watts Sherman in pursuance of that agreement. They covenanted to pay him and no one else, arid it is believed that in no case previous to this, was it ever held, that from an express covenant to pay one man, a promise could be implied to pay the same sum to another.
 

 If the plaintiff, before or at the time he contracted with James P. Greves, saw the agreement, he must have known that they were bound by covenant to pay Greves, and that Greves had no authority to bind them to pay the plaintiff; he must have known, that if they neglected to pay Greves’s drafts, the only remedy against them was on their covenant, and that the only way in which the plaintiff could have the benefit of that covenant, was to sue Greves on his drafts, get a judgment against him, and if he could not collect it by execution, he could then
 
 *436
 
 file a creditor’s bill against Greves and the defendants, and compel them to pay him all that in equity they owed Greves; or if Greves will assign the covenant to the plaintiff, he may sue upon that and recover whatever Greves is entitled to.
 

 I am therefore of opinion that the judgment of the supreme court ought to be reversed.
 

 Judgment affirmed.